We'll hear argument next in Case 14-840, the Federal Energy Regulatory Commission v. the Electric Power Supply Association and the Consolidated Case. General Verrilli? Mr. Chief Justice, and may it please the Court, the Federal Power Act expressly authorizes FERC to regulate the process that sets wholesale rates for electricity, and that is exactly what FERC's Wholesale Demand Response Rules do. Demand response is a resource that is bid into the wholesale auction, and the wholesale market operators that run those auctions rely on the bids to balance wholesale supply and demand, to set wholesale rates, and they particularly rely on those bids in periods of peak demand to avoid price spikes and to avoid blackouts and brownouts. Kennedy, if there were a student in Economics I, it seems to me that he would conclude and his professor would conclude that wholesale affects retail, retail affects wholesale. They are interlinked, which means you win the case, except that the statute makes the distinction. We have to make a distinction. Can you tell us what the distinction is that marks the end of Federal power and the beginning of local power? Verrilli, So I have several answers to that, Justice Kennedy. First, we completely agree that any action that FERC takes at the wholesale level in some sense is going to affect the retail market. All things equal, if FERC rules set a higher wholesale rate, there is going to be a higher retail price, but that can't be a basis, those kinds of effects can't be a basis for denying FERC's jurisdiction. And the case I would particularly point Your Honor to is the Mississippi Power case. Now, there was a case in which what FERC did was conclude that a utility could recover at wholesale its investment in a nuclear power plant. And what the Court held in Mississippi Power was that that had the effect of denying the State regulator the ability to deny that utility recovery of those costs in the retail rates, even though under State law they would have been imprudent costs and not recoverable. That was a very direct effect on the exercise of State regulatory jurisdiction, which you do not have here, by the way. So I think a fortiori, this is certainly permissible under the rationale in Mississippi Power. Scalia. I find that a pretty fuzzy line, very direct effect. It seems to me that there is a distinction between affecting retail rates, which as Justice Kennedy has pointed out, always happens, and using effect upon retail rates as a means of regulating wholesale rates. And the argument here is that that is what has occurred, that effectively FERC has to forego the benefit that that person would otherwise get from FERC's program. That raises the price at retail. And that is the means of achieving what FERC wants to achieve. Yes, FERC has the power to regulate wholesale rates. But the argument is not through the fiddling around with retail rates, which is what is asserted is happening here. So I think three points to be made in response to that argument, Justice Scalia. First, the authority that's exclusively reserved to States by section 824B of the Federal Power Act is the authority over retail sales. Every retail sale that occurs in the regime, in FERC's, under FERC's wholesale demand response regime, is a retail sale that will occur at the rate that the State regulator has set and under the terms and conditions that the State regulator has set. Every single sale that occurs, that is true of that. Second, what they have said is that this changes the effective rate. But what I would say in response to that, Your Honor, is that if I go out and buy a Ferrari for $100,000, everybody thinks that the price of the Ferrari is $100,000. Nobody thinks that the price of the Ferrari is actually $107,000 because I'm foregoing the $7,000 tax credit I can get if I bought an electric car. The rate is what it is. It's $100,000. And here the rate is what it is. And third, a point I would make, it seems to me it's a very odd argument to say that what FERC's rules do here is increase the retail price. What FERC's rules do is drive the retail price down by driving the wholesale price down by very considerable amounts in peak periods. This is a system that results in lower rates for retail consumers. Scalia. Oh, yes, ultimately, but the question is whether that is achieved by the means of directly managing retail rates. And you say this does not. What if FERC had sufficient funds available that it could pay people to not purchase electricity during peak hours, just said, you know, we'll give you so much per day, not to use more than X amount of electricity during peak hours? Would that be within FERC's power? Verrilli, I think that would be a harder case than this one, because all of the conduct that FERC regulates here occurs in the wholesale market, all of it. This is about what bids can be accepted into the wholesale market. Scalia. Oh, it's the difference between turning over money to these retail purchasers and simply depriving retail purchasers of a benefit that they could otherwise obtain in the wholesale market. Verrilli, I think this is a more straightforward case, because all of the conduct that FERC regulates occurs in the wholesale market. All of the actors are regulated in their role in the wholesale market, and FERC's purpose in this situation is to achieve lower wholesale rates and to allow, and to prevent, allow wholesale operators to prevent blackouts and brownouts. Roberts, but it's still based on direct price regulation of the retail rate. It may be the same point as your Ferrari hypothetical, but if FERC is basically standing outside McDonald's and saying, we'll give you $5 not to go in, and the price of the hamburger is $3, somebody goes up there, the price of a hamburger is actually, I think most economists would say, $8. As they give up the $5, they've still got to pay the $3. And your answer is, there's no impact on what the States can do, because they can still say, no, the price of the hamburger should be $2 or it should be $4. The point is that FERC is directly affecting the retail price. Verrilli, and I guess there's an additional point to be made in response to that, Your Honor. Here, of course, what FERC is doing is saying, here are the rules by which the wholesale market is going to operate, and if you come into the wholesale market, these are the rules that are going to apply to you, but ultimately, it remains up to the States, because FERC takes State law as it finds it here, whether citizens of the State can go into the wholesale market. They can only go into the wholesale market if FERC, if States agree that they can go into the wholesale market. So it's very difficult to see that as a problem. Scalia. That's interesting. If FERC has this power, how can it strip itself of this power by saying, we will not do this if the States don't want us to do it? Verrilli, I think FERC certainly has that authority in the course of deciding what's a just and reasonable practice. And in fact, I believe that that's what the Court held in New York against FERC with respect to FERC's decision not to regulate the bundled element of transmission there, because it was concerned about jurisdictional overlaps. And there, FERC didn't exercise its regulatory authority at all, and so it's a safe course you are on.  That's quite different from saying we are going to exercise it unless you, the States, veto it. I don't know if FERC really has that power. I don't know how it can confer a veto upon the States. Verrilli, It seems to me, Your Honor, that that's not an argument that goes to FERC's jurisdiction. That may be an argument, although no one has made it in this case, that if FERC believes that this practice is required to have a just and reasonable wholesale rate, that FERC can't then let States opt out. But again, that seems to me to be a merits issue, not a jurisdictional issue. And again, I think it's just incorrect under this Court's holding that FERC can't do that. Scalia No, I think it goes to whether FERC really thinks that it's meddling in retail rates. Verrilli, I know, Your Honor, but that's what it goes to in my mind. I think it's an acknowledgment by FERC that, in fact, you know, we are mucking around in an area that's the States' area, and if the States don't want us to do it, we won't do it. Verrilli, I appreciate that Your Honor dissented in New York v. FERC on a ground very much like that. But the Court held that that was a legitimate exercise of FERC's authority to decide what just and reasonable practices were, to take that jurisdictional overlap into account. And that's all FERC has done here. It seems to me quite clear that that is, under the logic of New York v. FERC, permissible exercise of FERC's authority. And so in a situation, it seems to me, in which what you've got is FERC taking State law as it finds it, you really can't say that this is an impermissible interference or a power grab or any intrusion into State authority, because the States ultimately make the decision. In fact, I think the Federalism argument is upside down here. This is a situation in which what you have is a FERC rule that really is a strong version of cooperative Federalism. What FERC is saying here is that this is policy that we think works, we think brings about billions of dollars in consumer benefits by lowering wholesale rates. Is it fair to say that FERC is luring retail customers into the wholesale market? Yes. Well, my friend has used that term, but I think that— And if that — well, if that were true, would that not be a serious problem for the government? It's wrong as a matter of history, it's wrong as a matter of law. This idea of wholesale demand response was not FERC's idea. FERC didn't impose it on the market, Justice Kennedy. This is a practice that grew up organically out of the private actions of market participants once the wholesale markets were deregulated. It's exactly the kind of innovative private market conduct that you would hope that deregulation would bring about. And the private actors, the wholesale market operators, brought that idea to FERC as early as 1999. One of the briefs, by the way, says that you had no authority to deregulate it. You know, we had a case involving the Federal Communications Commission, which wanted to dispense the filing of tariffs on the part of everybody, I think, except AT&T. And we held that the statute requires the agency to regulate rates and require filed rates. Isn't that a problem here, too? So I'm very familiar with that case, Your Honor. Yes, I'm sure you are. And this case is completely different. And in fact, I think, you know, we wouldn't want to do that. I mean, I like deregulated markets, but the problem is, do you have the authority to do it? I think that that bridge was crossed in New York v. FERC, it seems to me. And New York v. FERC held that that deregulation, that deregulatory impulse was within the authority of FERC and that there's nothing in the statutory text that precludes it. And I do think that's a key point here, that, you know, what we're talking about here at the end of the day is FERC's authority, which comes down to what the statute says. And what the statute says in Section 824e is that FERC has authority over practices that affect rates, wholesale rates. And there's just no doubt, given that all of the practices FERC is regulating  If we're obviously, that's true, but it's just as obvious, it seems to me, that you have to have some sort of limiting principle, otherwise FERC can do whatever it wants. So what is the limiting principle that you would suggest to us? Verrilli, I think the limiting principle that has worked quite well in the D.C. Circuit for years now is that the effects have to be direct, and it's a limiting principle akin to the kind of limiting principle, common-sense limiting principle that the Court has used in the ERISA preemption context with respect to relating to. And with respect to direct effects, what I would say is when you're — what you're talking about is regulation of conduct that occurs in the auction itself, participation in the auction, the rates that are charged, the bids, the nature of bids that can be accepted at the auction, the use of those bids to balance wholesale supply and demand, payment of the bidders at a rate that FERC prescribes, and recoupment of that payment in the wholesale market, all in the wholesale market, that you've got as direct an effect as you can have. And we're quite comfortable with the Court drawing a line that would exclude the kinds of examples, hypotheticals, that the D.C. Circuit came up with, regulating steel, regulating inputs into electric generation. We don't think FERC's authority goes anywhere near that far. But when you're talking about conduct that occurs in the wholesale auction, in the wholesale market, it's just at the core of the practices affecting jurisdiction that the statute says. That isn't the central conduct here. The central conduct is the refusal to buy power during peak hours. That occurs in the retail market. So why is that a direct effect? What you're telling people is if you agree not to buy power at retail during certain hours, we're going to pay you. That seems to me an indirect effect, not a direct effect. Verrilli, No, the conduct, that's an, that is, it is an indirect effect of the conduct that FERC regulates by market participants, the wholesale market operators and the participants in the wholesale auction. But that's an effect. The conduct that FERC regulates all occurs in that auction. It creates that incentive, yes it does, but all of the conduct is in that auction. It's clearly within the text of 824 E.A., and there is no text that unambiguously Mr. General, I believe that there's, I understood the retailers are not telling the, the selling generators, I'm not going to use it. It is the people buying from the wholesalers, which are a different entity from the retailers, who are doing it. That, that's correct, Justice Sotomayor. If I, I'd like to make one point and then reserve the balance of my time if I could. And the one point is this, there is no statutory text that unambiguously denies FERC this authority that it's exercising here over this wholesale conduct. And given that, Chevron requires that the Court uphold FERC's authority here. Thank you. Roberts. Thank you, General. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. Justice Kennedy, I think I'd like to start with the first question you asked, which is what do we learn essentially from Economics 101? And I, but I think the way you have to think about it is in terms of the actual market that operates in this particular case, which is a wholesale market. It's not a market that covers the entire United States. It covers less than half the States. But it is an important market that was created in order to create a basis for competition. And up to this point, prior to the demand response initiative that was not adopted by FERC, but was in fact pushed by my clients and those we represent in private business, what we were trying to do was to create a demand side component to that wholesale market, because trying to regulate exclusively or trying to deal exclusively with the supply side wouldn't work, or it's not as effective as it could be, or certainly wouldn't necessarily guarantee you just and reasonable rates. And so tariffs were filed in order to provide a basis for putting in the demand side. And the reason why this is a direct effect on the wholesale rates is because it's an absolute one-to-one relationship. If I put in a unit of, or reduce a unit of demand, I don't need as much supply, and that affects the price directly. That's the direct relationship that derives from the economic principles. And to my mind, the entirety of the Federal Power Act in 201, 204, 205, ask you in the first instance to look at the wholesale market that exists. And once you do that, then is this, you know, it's not, does it affect the retail rate? Clearly, it will. The question is, did what FERC do here in the order directly affect the wholesale rate? And on that score, it seems to me there's no question. Then the issue becomes what is the State's position? I think moving directly to control retail prices, subsidizing certain retail purchases, that also would directly affect the wholesale rate. And does that mean FERC is authorized to do that? I don't know that it would directly affect the wholesale rate in nearly as exquisite a fashion as the regulation in this case. Because, again, you're talking about the exact same transactions going on and affecting supply and demand. Nothing can affect the wholesale rates that way. If I make an effort to manipulate the retail rates, maybe eventually it will affect the wholesale rates, but it will do it in ways that are very indirect, as we explain in our reply brief. It may go up, it may go down. It's impossible to know. There's no way to doubt that if I reduce supply, that that will in fact or if I reduce supply, that will cause the rates, the wholesale rates to drop and that's a natural consequence. Kennedy, it jumps forward too quickly to really the second question, did the FERC comply with its obligation to explain the reason for its change? But it does seem to me that they come close together. FERC's argument is essentially circular. It says, well, the market forces will work this out, but we define the market. That seems to me circular. Well, I mean, I don't know that we define the market. We've allowed the market to be created. Kennedy, there are two parts to this argument. One is jurisdiction and the other is whether. No, I understand that, but the question is, what price will allow this, will promote this market to create incentives to allow you to have enough on the supply side or on the demand side, I'm sorry, in order to make this meaningful? And what the FERC said was when we had experience with one of the regional transmission operations, what happened when they reduced the price? The amount of the demand response dropped precipitously. And as a consequence of that, based on that experience, we now have enough evidence by which to say, wait a second, we need to go back and raise the price in order to bring in more of the demand response in order to ensure that there is a reasonable balance between the supply and the demand. But all of that's in the wholesale market. This doesn't come close to violating the principle of Louisiana power where this is a retail authority that is preserved to the State, and that's to set the rates for retail sales. Roberts, I'm sorry, you're wrong. Roberts, The problem is that what FERC is doing basically leaves the States with the pure formality of setting the rate that is going to be directly affected by what FERC is doing. In my hypothetical, if you remember, I mean, they get to say how much the hamburger costs once you get it in the store, but FERC can respond to it directly by setting the price to encourage you not to enter the store. If it's $5, we'll give you $5 not to enter, and a burger is $3. If the State gets to say, no, no, we want it to be $2, and then FERC just says, all right, we'll give you $6 not to enter. Phillips. Right. But that all assumes that what FERC is trying to do here is to, in fact, directly regulate the rates. That's not — that was never the intention behind this exercise. The intention here is to try to manipulate, not to manipulate, but to control wholesale rates in a way that would reduce it. It may not be the intention, but it's the mechanism. Right. But the statute. So you say, oh, well, we didn't mean this, but we're doing it. Well, you know, one oak sort of says what you intend, what your intent is and what's directed at actually controls in some ways this area. But we're talking about a situation of concurrent jurisdiction between the State and the Federal Government in this particular context. And so the fact that there are going to be effects on the retail rates doesn't deprive FERC, which ultimately is the supreme authority here, as long as it operates within the sphere of adopting, of dealing with a practice, regulating a practice that will, in fact, affect the wholesale rates. And that's precisely what it has tried to do in this particular context. And, Justice Kennedy, I don't think there's a problem with respect to the way the rates were set, because, again, if you do it in this very sort of fundamental economics 101 approach, which Dr. Kahn is the one who was the primary proponent of it, said, look, if you're taking out demand, if you're reducing demand, that affects supply directly, and therefore you should compensate them exactly the same. And FERC looked at that and said, you know, that makes perfect sense to us. That's an appropriate way to go. That will, you know, that's not luring people. That's just providing a basis upon which there will be enough of a market in order to allow the wholesale side of the grid system to operate in an efficient way, not only to reduce the wholesale prices, which is important, but even more fundamentally, Your Honor, to protect the reliability of the grid. That was what prompted, frankly, the initial effort to deal with this entire demand response issue, was to figure out what are we going to do about brownouts? What are we going to do about blackouts? How are we going to be able to do it, because we can't do it if we just do it on the generation side. We need to reduce the demand in order to ensure that in response to these kinds of crises, there is an answer. This is the answer. The Commission has operated exactly the way it ought to have under these circumstances. Scalia. Why aren't all the companies in agreement with you? Why are there some private companies on the other side? Well, most of the private companies on the other side generate electricity and would prefer not to manipulate the supply side, because they're going to manipulate the demand side, because they like to have all the supply side going to as far as you can take it. But they're not all generators, I don't think. They have pretty — I mean, a substantial number of them. I mean, the vast majority of them on the other side are generators, Your Honor. Well, maybe your colleague can answer. I'll let him count up his amicus briefs, if he wishes. And the last thing I guess I would say is I agree with General Verrilli's point that if at all — if all else fails, this is clearly a question — these are both questions that are — in which the Commission deserves deference. It deserves deference on the question of the scope of its jurisdiction, and it assuredly deserves deference, Justice Kennedy, in deciding as between locational marginal price and locational marginal price minus G or minus G plus A or however you would go about that. If there's any issue upon which this Court ought to say the Commission gets more than a thumb on the scale, it would be that issue. If there are no further questions, Your Honor. Thank you. Roberts. Thank you, Mr. Phillips. Mr. Clement. Mr. Chief Justice, and may it please the Court, I don't usually start in this Court by telling you who I represent, but I think I better do it here, which is I represent not just EPSA, which is a group of power generators, but a number of other organizations. So the vast majority of the people that I represent are load-serving entities who are not exclusively on the supply side. They're actually the regulated public utilities that actually could provide demand response in a wholesale meaningful level by working, as they have since long before FERC got in this business, to work with retail customers and their State regulators to provide for reduced retail demand at peak time. So that's who I represent. Now, where I'd like to start beyond telling you who I represent is with the notion of what FERC was trying to do here, which was to reduce retail demand by providing payments to retail customers on an otherwise wholesale market in an effort to change the effective price for retail sales. Now, that sure sounds like something that belongs to the States. So the answer you hear from the Solicitor General to that is that it's not a question of who I represent. Sotomayor, where is that in written anywhere that that was their goal? That's how you've characterized that goal. But what I've heard them say is we're trying to lower the price of wholesale to a more just amount. That's what's in anything I've seen written. You've recharacterized it. Clements. I don't think it's just a characterization battle ultimately, but even if you want to stipulate that they are trying to reduce retail demand for the best of wholesale reasons, it's still the same. Sotomayor, it's crystal clear, and I don't think the Solicitor General will contradict  for the best of wholesale reasons. What FERC does uniquely in this context is invite retail customers directly large retail customers directly on the wholesale exchange. Breyer. That is true. What you say is true. Every reduction in demand for a unit of retail electricity is ipso facto a demand for a reduction of a unit of wholesale electricity, and vice versa. So it's hardly surprising that anything they do in the wholesale market that adds to demand will add to demand in retail and vice versa. But I thought that their motivation here is the following. On the 4th of August at 4 p.m., people turn on electricity for air conditioning. That's the peak hour. The industry, leaving reserves out of this as a fixed matter, is the peak hour. Has to supply that. So if there are not enough generators at 4 p.m. on August the 4th, they have to build one. And to build an additional generator, I don't know what gas costs now, but let's imagine it's $500,000, and that will be passed on in the wholesale price. And then probably, though the States are free to do what they want, in the retail price. So FERC thinks, I have another way of doing this. For only $400,000, I can be sure that on the 4th of August at 4 p.m., the demand is not great enough to spend the 500, and so we group the people who will promise to fulfill their air conditioning at other times. That way, the price of wholesale electricity falls, and therefore, we satisfy all demand at a lower price. We are interested in wholesale. We are interested in how to satisfy peak wholesale demand. And we have worked out a way to do it cheaper. Of course it affects retail prices. So does everything we do in respect to wholesale prices. End of the matter. So I accept your characterization, but I do not see any law that prevents them from doing that, the fact that that affects retail price. And I certainly wouldn't be here suggesting that anything that happens in the wholesale market that affects retail price is somehow verboten to FERC. But I am here to say that when you regulate wholesale prices, essentially, as Justice Scalia suggested, through the retail market, that that crosses a very important boundary on the Federal Power Act. And with all due respect to your question, your approach to this would make perfect sense if FERC were the only regulator on this theme. Breyer. It didn't affect the regulator. It didn't try the regulator. What it said was we have a group of people who will put customers together. And those customers will, in fact, cut demand at 4 p.m. on August 4th. As I say, that affects retail price. So does everything. And what is the difference here, and that's what you want to get at, so I'm letting you do it. The difference here and what I just said. The difference here is that the customers they're targeting are retail customers. And the very fact, and this is where I really wanted to go, which is I think the Solicitor General goes a long way to conceding that this really is going at retail, the retail market, and the retail level of demand matters, and he will concede that we're changing they're changing the effective price of retail electricity. The saving grace for them is, ah, but we're limiting ourselves to the wholesale market, and we're the wholesale regulator, so why shouldn't we do it? Here's the problem. These retail customers don't belong on the wholesale market. Whether you think they were lured in or you think they walked in the door, it doesn't matter. They are on a market where they don't belong. The fact that they are regulating in this context, in this context alone, retail customers directly is a profound signal that they've overstepped their jurisdictional bounds. And I think the way you can understand why the fact that they're on the wholesale market is not a complete answer is to consider the following scenario, which doesn't seem all that far-fetched, which is to say a large retail consumer of electricity, let's call it Walmart, decides, you know what, I like the prices on the wholesale market better, and I buy more electricity than a lot of load-serving entities in small jurisdictions. So I'm going to walk on to the wholesale market run by an ITO or an ITO, and I am going to buy electricity for my own consumption at a better price. If they did that, I don't think there is any question that that would be a retail sale that could only be regulated by the States. And if that actually happened, then the RTOs and the ISOs would have to make a choice. They would either open themselves up to regulation simultaneously by FERC and the States for that retail transaction, or they would do what I think they probably would do, which is run regulators plenty. We're just going to say that Walmart can't come onto our market and buy retail gas directly from a generator. And that's the world we live in. Walmart can't walk on that market and buy for retail. Sotomayor, So what's the horror here of concurrent jurisdiction? You seem to posit that this is horrible, but if in fact it's lowering prices, Walmart sees it as a lowering of prices. Hard to think of why States would say no, but some of them have. But I'm not sure what the problem is with concurrent jurisdiction. Clements, Your Honor, I'm not sure ultimately that my burden is to show that this is horrible as opposed to ultra-virus, but let me try to explain to you why concurrent jurisdiction is an anomaly in the context of the Federal Power Act. I mean, this Court on numerous occasions has said that although it's sometimes hard to divide the lines, once you do, generally the Federal Government operates in its exclusive sphere of the wholesale market, and the States regulate in exclusively in the retail. Sotomayor, But they all, each of them affect each other. Clements, But here's the problem. Yeah, normally they stay away from each other and each other's customaries. Another thing that is a complete anomaly that FERC has created here that as far as I'm aware exists nowhere else in the energy world, is you actually have the Federal Government and the Federal regulators and the State regulators bidding against each other for the same customers to reduce their same retail demand. And the other side has made a very big deal that none of the States raised a jurisdictional objection before FERC itself, but there were a number of States, Ohio, Illinois, and all of the States that are participants in the MISA, one of the ISOs. And what they told FERC is, by all means, do not set the compensation level at LMP, because that's too high, and by setting it so high, what you are going to do is you are going to crowd out our own efforts at dealing with demand response. Because we love demand response, we want demand response, but we don't want to pay twice as much as the market really should pay for demand response. And if you're out there offering our same retail customers the ability to get demand response paid at huge LMP levels, then we're going to be crowded out. Now, the only response that FERC can offer to that is, well, then just opt out. Come on. You know, first of all, that's the third anomaly here, because there's no other area of regulatory authority where FERC allows States to opt out. And if you think about what they're opting out and compare it to their legal theory, it doesn't work. I mean, since when is FERC all of a sudden enthusiastic about State experimentations with practices that directly affect wholesale rates? In every other context where they actually have jurisdiction, wholesale rates, transmission, not only would they not allow State opt-outs, but they would say that's going to lead to discrimination in a way that would be unjust and unreasonable. So the opt-out option here, though, doesn't work for another reason, which is it's worse for the States that most want to provide for demand response. Because what they're being told is, all right, you have a subset of your customers who are actually interested in demand response. And if you want to opt out, what you have to tell your customers who are interested in demand response is we're actually going to pass a regulation that restricts you, and you can't go into the Federal market and get a better rate. You're going to pay a lousier rate. Breyer. If you're right, then I guess the FERC could not direct the grid approvals in a way that would, in fact, prevent certain retail customers from buying electricity at certain times. I guess that FERC could not, in fact, allow large consumers of electricity to buy it wholesale, because that would take the retail customers away from the jurisdiction of the State. I guess that FERC could not, in fact, insist upon marginal capacity being generated from natural gas instead of from other things, because that will affect the price of natural gas, will affect the wholesale rate, thereby raising the retail rate, thereby stealing customers away from, let's say, Ohio, where it goes up, and forcing them to go to Texas. I mean, I have not been surprised that I have found no case in which FERC ever tried to do anything roughly comparable or even by the roughest analogy that would say that they cannot do this for the reason you suggest. Clements, Well, Your Honor, there's a lot in that question, but let me just respond. Breyer, All there were meant to be was three examples, and I don't know how good they are, but they come to mind. Clements, Well, with all due respect, a couple of them aren't that great, because you seem to suggest that if we can't do this, well, then FERC can't essentially tell generation resources that we don't want any more coal generation, we only want natural gas. And, of course, they can't do that, because the Federal Power Act reserved the plenary authority over generation to the States. You also suggested if they can't do that, then they can't allow Walmart to helpfully walk into the wholesale market and buy a refill. Breyer, I was grasping your point, which I hadn't grasped previously, and your point seems to be that the problem here is the way they are reducing the demand, and therefore the cost of wholesale electricity, is by taking groups of people and preventing them from buying electricity at all at certain times, which, of course, affects their buying retail. Isn't that basically your point? And if it is, I was trying to think with that argument. That's why I said that you can skip the whole thing if you want. Clements, Well, here's a way of trying to harmonize that, which is I think that the line that the Federal Power Act divides, draws, is between retail sales and wholesale sales, and I believe that this is impermissibly on the retail side of the line. I think my friends on the other side ultimately think that the difference isn't between retail and wholesale, but is between sales and non-sales, because they appear to concede my Walmart example in the retail world, which is to say, on page 39 of this SG's brief, I think they pretty much concede that Walmart cannot walk on to a wholesale market and purchase gas at retail without coming into the scope of the State regulators. I think they also concede that if the government's interest here was not to suppress retail demand, but to increase it, they thought, you know, if we could just sort of boost retail demand a little bit, we'd get a whole bunch of these new green resources online, and it would actually make, you know, everything better. So we want to increase retail demand. So here's what we're going to do. We're going to have either directly or through the wholesale operators, we're going to pay a bonus to people who increase their retail purchases. That, I believe, my friends on the other side say, well, no, FERC couldn't do that, because that would affect a fully consummated sale. So their position seems to be, although we can pay — we can't pay incentive payments to increase retail demand, we can pay incentive payments to reduce retail demand. Two observations about that. One is, why in the world would that make sense? I mean, why in the world would Congress have divided the authority here in a way that allows the Federal Government to suppress retail demand, but not increase retail demand? The second thing that I want to say about that anomaly, though, is the line between sales and non-sales can't be the right line, because if it is, then not only can they do what Justice Scalia suggested, which is have FERC pay a direct bounty not to purchase. And I was actually quite surprised by the Solicitor General's answer to that, and he — and he didn't fully complete the answer. He said that would be a harder case, but he didn't ultimately say how that would be answered. I think he has to say that if FERC sort of cut out the wholesale operators and just said we've got a new appropriation and every retail customer that reduces their retail consumption gets a $200 check from FERC, that has to be consistent with their position that FERC can do it, because it doesn't interfere with a fully consummated sale. But worse still, if they're right, then what FERC can do tomorrow is solve this problem much more directly. They can say, retail customers, you cannot buy at peak times. You simply can't. We're not going to allow it, because that's going to reduce the wholesale demand. It's going to avoid brownouts. It's going to take all the pressure off our grid. So that's it. No more purchases on August 4th. Scalia. And they're not regulating the rate of sales. Clement. They're not regulating the rate of sales, so, you know, never mind. Or the rate of sales is either zero or infinity because you can't do it. But any way you think about it, that has to be the implication of their theory that there is a categorical difference between the rate of sales and the rate of sales. Breyer. Well, the question is, is it reasonable in what they do under Chevron? It's a broadly phrased statute. What they have to do is reasonable. And so, really, the question is, is what they're doing here unreasonable? And we're not electricity regulators. They are. It's pretty tough and technical, and so that's why I've been trying to figure out just what it is about this thing that, in your view, makes it unreasonable. Clement. And what is unreasonable is that before you get to a Chevron question, certainly before you get to an arbitrary and capricious question, you have to have jurisdiction for FERC to do this. And the basic division of authority in 201b of the Federal Power Act is that the Federal Government gets sales for resales and the States get all other sales. And I think it's important to recognize that you really have to wrestle up front with the 201b question, because the other side loves to talk about 205 and 206 in the practices-affecting language, but the problem with that is that 201b specifically says that the provisions of this subchapter, which include 205 and 206, shall apply to sales for wholesales and shall not apply to all other sales. So you don't get to 205 and 206 if what is being regulated front and center is a retail sale of electricity. Mr. Clement. Kennedy. Kennedy. At some point, I want you to assume that there is jurisdiction, but to discuss your point that section that Rule 745 particularly was arbitrary and capricious, I assume because adequate reasons or no reasons were given, or maybe there are some other points, but at some point before your time runs out. I will definitely do that, Your Honor. I don't know if you had a question that goes to jurisdiction that you want to talk to. I mean, I don't know. Do you mind, Justice Kennedy, if I go? I mean, I take it that the implications of your argument is that FERC can't do anything with respect to demand response. Is that right? No, that's not right. My position is that FERC can't do anything with demand response with retail customers. They can do demand response, true wholesale demand response, which they were actually doing before they went down this route in around, you know, the early 2000s. And the way that wholesale demand response works is the way you sort of naturally think it would work, which is through a participant in the wholesale market, namely through the load-serving entities who are mostly my clients, because the way you can sort of do this is you work cooperatively with the States and the LSEs, and you encourage them, as Congress suggested in 1252e of the National Policy Act or the Energy Policy Act, you encourage them to do all sorts of things to reduce their demand, and then there's just less demand bid in to the auction in the first place, and so supply meets demand in a much lower level. Just for completeness sake, you can also have wholesale participants participate in a demand response program in the forward capacity markets, where, again, it would be the LSEs, and what they would do is say, we're going to, three years hence, we're going to reduce our compensation or our consumption by this level, and we're going to do it on the local level. And just to further complete that thought, you know, it's nice to talk that FERC has been doing this since 2000, but the States have been doing this long before that, at least since the 1980s, and there is a brief for other Respondents that I don't represent, the Midwest load-serving entities, and it's worth it, it's a short brief, and it's worth a quick read, because what they say is, look, we've been doing this at the State level since 1984, we're a local utility, we work with our local regulator. Because we have plenary authority over the retail market, we can deal with demand response in all sorts of ways that FERC could never imagine. And we can do things like basically go in and get a local customer to agree with us to change their thermostat, we can go in, send somebody in, put different hardware in there, and then based on a reduction in their retail rates, we can get them to agree that basically on a hot day in the summer, we get to take over your thermostat, and we directly impose demand response through that. And that's the kind of thing that States have been doing since the 80s, and that's the kind of things that are going to be crowded out by this one-size-fits-all rule with the high L&P compensation rate. Kagan. As to this sort of practice, though, so I'll just narrow the question, where it's retail actors who are bidding into a wholesale market. Right. I take it that there, there would be a regulatory gap. In other words, FERC can't do anything, nor can the States do anything. I — there is not a regulatory gap. I don't think FERC can do anything, and I would answer it by reference to my Walmart hypo going into buy. If Walmart went into buy, so if a retail customer on the buy side sort of walks into a wholesale market, it's not that lightning strikes and they can't do it. It's that it's a retail transaction. So if anybody can regulate it, it's the States. So there's not a regulatory gap. In theory, a State could regulate the transaction even though it takes place on an otherwise wholesale market. I think as a practical matter, I don't want to — as a practical matter, I don't think the ISOs and the RTOs want to be regulated by both FERC and the States. So I think what they would do is, ah, if the price of having a retail customer on an otherwise wholesale market is we get State regulation on top of Federal regulation, then we're going to bar the door to the retail customer. Roberts. Maybe you can turn to the question Justice Kennedy asked you to address. I would be delighted to, if I could say one last thing about jurisdiction, which is simply — I do think, though, that the premise of the other side's argument is that the sky will fall if you don't have this precise type of retail customer on wholesale market demand response. And there I think it's worth taking a look at the Southern Company's brief, because they operate in a part of the country that doesn't have an RTO or an ISO. Kagan. It just is an odd result, given this Energy Policy Act, which made it so clear that Congress liked demand response, that it wanted FERC to lower barriers to demand response, to then say, well, FERC has no jurisdiction to do exactly what the policy that Congress articulated is. But the problem with that way of looking at it, Justice Kagan, with all due respect, is I think it looks only at 1252F, which is the one reference to what FERC is supposed to do, and it ignores 1252E, where Congress recognized that the States are the primary actors here. And the point I was making about the Southern Company brief is operating in an area without ISOs, without RTOs, so without FERC, they actually have a greater level of demand response than other parts of the country that have the Federal role. So to bring us to the arbitrary and capriciousness question, I think, Justice Kennedy, the way I think about it is that we have both procedural objections and substantive objections. The procedural objections are essentially that there are all sorts of objections to using LMP as the price to provide compensation. That wasn't just my clients. That was also the States that I alluded to who were worried that this high level of compensation would crowd out their effort. It was particularly poignant comment from the ITOs and RTOs who design these, run these wholesale markets. And the ones that I thought were most persuasive in some respects was the operators of the MISO, the Midwestern one, because at FERC's direction, they basically spent 2 years trying to come up with, get all the stakeholders in a room and come up with a formulation, a compensation formula that worked, and what they came up with was essentially LMP minus G. And after having spent 2 years with all the stakeholders coming up with LMP minus G, they were then told by the Federal Government at a late breaking hour that there was a one-size-fits-all solution, and it was LMP. Sotomayor, that's the classic choice that we give agencies. They had expert testimony, Dr. Kahn, who was undisputed to be a leading expert in this field, say the opposite. I mean, how do we choose to go into the weeds of something as technical as that? Well, I think that's why I say that's been entrusted to the agency. Surely it has. But the reason I started with the procedural way of coming at this is the D.C. Circuit has lots of arbitrary and capricious cases, and they are quite comfortable in saying that in circumstances like this, you didn't respond adequately to the comments that were put before you. Sotomayor, would you tell me which one? I mean, I looked through everything that the dissenter said, and there is at least one or two or three paragraphs in the FEC's report on this that directly explains why they chose a different route. Well, there's certainly the court below didn't give us one comment by the dissenter that wasn't addressed by something said in the report. Well, I can give you an example, Justice Sotomayor, if it will help, which is that Chairman Mueller in his dissent, Commissioner Mueller in his dissent actually used a hypothetical that is very similar to the hypothetical discussed in our brief in the S.G.'s brief about a factory and how, if you have full LMP, a factory will essentially reduce its production at time periods where it's economically inefficient for them to do so. And they recognized that, and what did they say? They had no question. Only when it's economically feasible will we pay this price. Well, the way I read the record, Your Honor, is that there was no response to that hypothetical, just as there was no response in the S.G. brief. The response was, where it doesn't work, we won't use it, which I didn't find a very satisfactory response. Isn't that essentially what they said? I'm not even sure they said that much, but I don't think they really grappled with it. And to whatever extent they thought that the response was what Justice Sotomayor and the way, I wouldn't characterize it that way, but it's called the net benefits test. And the net benefits test means this is not a one-size-fits-all. And then in the order, at paragraph 17, 18, page 67, they go through a bunch of methodologies and they explain, I mean, they say we're picking this one. And the reason that they picked this one, I guess, is they think it's, if you try a G thing, that also is a problem administratively. Okay. Now, I'll just read those. Is there anything else you're going to tell me that I'll read them and see what they say, right? Sure. Well, I would, I would, I would encourage you to look at the FTC comments, the Joint Appendix, page 281, the comments of the States. I mean, I would think that when you have another coordinate part of the Federal Government come in and say you are picking the wrong compensation level and it will be affirmatively inefficient and will crowd out other uses for demand response, that you'd at least owe them something more of an explanation than grouping them in a footnote with every other commentator you got and say, we're not persuaded by that. There is, though, I think, and I actually, you know, I didn't think I would come up here talking about net benefits test, but I actually want to. But I read Schiketti that writes about that in the brief, doesn't he? Yes, yes. And so I think that's the best brief to read on that. Yes. And, and, and what I would say beyond that about the net benefits test is here's another way in which the compensation formula is what I would call substantively arbitrary and capricious. The whole formula is built on the idea that there is an equivalence between less demand and more actual supply of energy. But, of course, when you get to the nitty-gritty of it, it turns out that's not true, because the great thing about actual supply of energy is that other wholesale, real wholesale customers buy it, and then the market clears naturally. But when you start getting a third party in there, a retail customer who really doesn't belong there, and start saying we're going to pay you money, but that money doesn't actually result in load that a load-serving entity pays for, that creates a deficit in the wholesale account. Kennedy, is one way to think about that is that the FERC's argument is circular. It says, well, the market will take care of this, but we define the market. Yes, and yet it's the market really can't take care of it, because the market is designed to simply get a bunch of wholesale sellers and a bunch of wholesale buyers together, and the price of the sales and the price of the purchases equal each other out, and everybody goes home happy. But when you invite retail customers on and say, guess what, we're going to pay you not to buy, that creates a market imbalance. The FERC euphemistically refers to this as the billing unit effect, and then they have to solve that by making adjustments to the market-clearing price, and then to make sure they don't go too far down, they apply the net benefits test, which is not only mind-bogglingly complex, but FERC itself recognizes that it's imperfect. The last thing I want to say, though, about sort of the substantive unreasonableness about this is there is a more fundamental problem here, and it's, I think, the economist's brief on our side gets at this very well, which is at the end of the day, if FERC gets to do this on the wholesale markets, what is being purchased is not energy, actual energy that's been bought and then sold. What is being sold is an option to buy electricity at a subsidized retail rate. And in any other market, I mean, think of a stock where I have an option to buy it at 20, and the market price is 40. Lots and lots of people are going to offer me 20, 19 for that option, because I have a valuable right to buy something at a below-market price. But nobody is going to offer me 40 for the option to buy at 20 just because the market price is at 40. But that is exactly what FERC has done by setting the compensation rate at LMP. And they made mincemeat out of poor Dr. Kahn, because what Dr. Kahn really says is that the market signal that the customer ought to get is LMP. But the market signal they get is LMP if it accounts for avoided costs. If you take the avoided costs out of the question, then you get LMP plus the retail costs. And, of course, another irony here is the distortion is greatest in those markets where the States have done exactly what FERC would like, which is adopt retail price, real-time pricing, because then the retail price is LMP. And so what is the compensation rate for demand response providers? It's twice LMP. Breyer, I mean, I thought that the, frankly, the net benefits test was meant to deal with this problem. I will read Kahn's testimony, I promise. I will read Scheketty, and I will read Hogan, too, okay? Clemente, please read Dr. Hogan as well, because I really do think he has the better of this argument. Now, you would say generally, well, a couple of expert economists just let FERC decide. But I do think in this case they have strayed beyond the bounds of arbitrary and maliciousness. Kennedy? Kennedy, I take it you're asking us not to make the judgment as to which was right and which wrong, but that FERC did not address it by giving specific enough reasons. Yes. That is the principle reason. But I don't want to suggest that it's just purely procedural, because I don't think these are things they can fix. And, of course, we hope that you don't even get to that question because we find they don't have jurisdiction. Thank you. Roberts. Thank you, counsel. Five minutes, General. Thank you, Mr. Chief Justice. Starting on the jurisdictional issue with text, my friend pointed to section 824B, which you can find at 1A of the appendix to our brief. What it says is not that FERC shall have jurisdiction over sales of electricity at wholesale. It says the provisions of this subchapter shall apply to sales of electricity at wholesale. One of those provisions is 824EA, which says FERC shall have jurisdiction over practices affecting wholesale rates. So we're within the plain terms of the statute, and there is no statutory text that plainly forecloses FERC's exercise of jurisdiction, and my friend in 30 minutes didn't even try to identify one. So in terms of applying Chevron, there's no doubt that FERC's interpretation has to be upheld. With respect to the Walmart example that my friend identifies, I think it shows why his argument about her medically sealed-off retail and wholesale spheres really has nothing to do with the real world. In the real world today, large customers can buy directly. They can do it through contract, and they can also go into the wholesale market auctions and buy if their State's permitted, and that does happen in the real world. And this is really no different, because demand response entities that want to come in and participate can only do so if their State law allows them to do so. So it's no different than what's been going on in the real world for quite a long time. Third, with respect to the load-serving entities, the utilities, my friend says, well, don't worry about it, they'll do all the demand response, it'll work great. FERC addressed that. It addressed it directly. It found that load-serving entities don't have sufficient incentives to engage in demand response, and it's obvious why they don't, because they cannibalize their own profits. The higher costs they have, the higher their rate of return profits are going to be generated. They will do it under commands from State regulatory agencies to do it, but they'll do it grudgingly. And what FERC said is you want people to come in who have a real profit motive to do it, and Natalin sent the LSCs to get in there and try to get a piece of the action rather than letting it go to somebody else. But FERC addressed that issue specifically. Now, the idea that demand response can't work, the State-level demand response, retail demand response can't work where wholesale demand response is operating, you know, again, the real world just contradicts that. We have 24 States in which this is going on, and if this were a problem, you'd expect to see in this administrative proceeding some evidence that it was a problem, and there is zero evidence. You look at all these briefs, there isn't a citation to anything in the administrative record that suggests that the Federal and State programs can't work in harmony, and FERC made a finding that they can work in harmony. Now, with respect to just one point in arbitrary and capricious, then I'd like to sum up. I think if you're going to look at one thing in terms of the concern you've raised, Justice Kennedy, I would look at page 223 of the appendix to the petition, of our petition. And what you will see right there is FERC directly identifying the problem that my friend spent the last few minutes of his argument on, and then going on to say, and then going on to explain in great detail for several pages why that critique is wrong, and citing in particular the paragraph of Dr. Kahn's declaration where Dr. Kahn is responding to the specific critiques that my friend made. So it certainly meets the threshold test of an adequate explanation for a decision. Now, if I could sum up, I think this is what this case comes down to. On one side of the scale, you've got a practice that saves billions, that has saved billions of dollars in wholesale costs and will save billions of dollars, and is an effective tool against blackouts and brownouts, and that nobody has shown in the real world does any harm. You have a statutory provision that gives FERC specific authority to regulate this practice. You have no statutory provision precluding it. You have Chevron in case there is any doubt. And you have really a strong cooperative federalism program here in which States have the — States are masters of their own fate. Whether customers in a State participate or not is up to the State. If the State thinks this is not a good policy, the State can say it doesn't operate in our State. On the other side of the scale, what you've got is an argument that all those benefits have to be extinguished, and no argument in the record that there was any harm from this program. You have no clear statutory text forbidding FERC from engaging in this regulatory practice. And my friend used the phrase one size fits all. Well, I suggest that really what we've got here on the other side is a faux-federalism argument. Their argument is the one size fits all. There are lots of States out there that want their consumers, want their citizens to participate in this, because they think it's good policy and it's completely harmonious with their regulation. What my friend's argument does is wipe that out and say, no, it's one size fits all, and then what's — and that one size that fits all is that nobody can participate, not even the 24 States that want to do it. Thank you. Roberts. Thank you, General. The case is submitted.